UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Crim No. 22-CR-96 (CKK) |
| | ) |
| WILLIAM GOODMAN | ) |
| | ) |

**SENTENCING MEMORANDUM IN AID OF SENTENCING WILLIAM GOODMAN**

Defendant William Goodman ("Mr. Goodman") submits this sentencing memorandum in support of his request for a sentence of time served, a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.[1]

### Factual Background



"Over and over again, people had to disobey lawful authority to follow the voice of their conscience. This obedience to God and disobedience to the State has, over and over again, happened throughout history." *Dorothy Day.* The voice of Mr. Goodman's conscience informs him to peacefully witness for the lives of children, and against those he believes are unjustly taking them, in the hope that his peaceful witness will change hearts and minds. Following the

---
[1] 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85 at 101(2007).

1

voice of his conscience, on October 20th, 2020, Mr. Goodman peacefully participated in what was to be a non-violent "sit-in" type protest at Dr. Cesare Santangelo's Surgi-Clinic facility in Washington D.C., a facility where a Dr. Santangelo performs late trimester abortions, i.e. post viability abortions.  Dr. Santangelo had previously admitted on video that if a baby was delivered before the termination part of his procedure, it would not be helped.[2]  Ms. Handy, the organizer of the protest, had viewed this recorded admission,[3] and coupled with her own research into the matter, came to the belief that live birth abortions were being performed at the Washington Surgi-Clinic.[4]  Motivated by this belief, Ms. Handy chose the Washington D.C Surgi-Clinic as the site for a non-violent sit-in protest,[5] a belief and motivation she communicated to the attendees, including Mr. Goodman.[6]  Notably, while later witnessing with others outside that same Washington D.C. Surgi-Clinic in 2022, Lauren Handy and another protestor were given a sealed box of the Surgi-Clinic's medical waste from a driver loading it into his truck.[7]  Inside, they found more than 100 fetuses from early-stage abortions, and five fetuses with well-developed limbs and facial features, possibly the remains of children born alive and corroborating what she, Mr. Goodman and the other codefendants feared was happening at the Washington D.C. Surgi-Clinic.  Notably, those remains were taken to the DC Medical examiner and on April 5th, 2024, Members of Congress sent a letter (attached as <u>Exhibit A</u>) to D.C. Mayor Muriel Bowser and Police Chief Robert Contee demanding an investigation into the deaths of these children at the Washington D.C. Surgi-Clinic.[8]

---

[2] "Let's say you went into labor, your membranes rupture, and you delivered before we got to the termination part of the procedure here, you know, then we would do things, we would, we would, we would not help it." *Dr. Cesare Santangelo, proposed Defense Exhibit # 4 video starting at 45:58.*
[3] See *e.g.,* 8/22/2023 Trial Tr. at 19:2-23 & 20:1
[4] *Id.*
[5] See*, e.g.,* 8/22/2023 Trial Tr. at 69:13-17.
[6] See*, e.g.,* 8/22/2023 Trial Tr. at 87:17-25 & 88:1-17 & 71:1.
[7] https://www.nbcwashington.com/news/local/group-claims-fetuses-in-dc-home-proof-of-illegal-abortions/3017603/
[8] https://www.wusa9.com/article/news/local/dc/republican-senators-representatives-want-dc-police-mayor-to-investigate-fetuses-found-in-dc-home/65-172fbcf2-6782-42ea-ba93-845dc2489b1b

In any case, virtually all of Mr. Goodman's actions that day were caught on some sort of visual media, and what they clearly depict is that Mr. Goodman physically harmed no one, and threatened no one, but rather peacefully witnessed and prayed, kneeling for most of the time, in protest of what he believed to be happening at the clinic and in the hope that mothers would choose life.  The bag of chains he helped carry in for some elderly codefendants was used by those codefendants to chain themselves together in peaceful non-violent protest.  For his peaceful witness at this clinic on October 20, 2020, at the time of his sentencing, Mr. Goodman will have spent nearly nine months incarcerated.  In no other context in the vast panorama of American protest movements would non-violent civil disobedience, from which the defendant had nothing to gain personally, give rise to significant criminal liability, much less years of incarceration in a federal prison.  In that context, nine months incarceration for his actions is much more than a "sufficient, but not greater than necessary" penalty to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

    I.        **THE SENTENCING GUIDELINES**

On March 24, 2022, Mr. Goodman was indicted, and on August 29, 2023, Mr. Goodman was found guilty by a jury of Conspiracy Against Rights in violation of 18 USC § 241, which carries a maximum of 10 years imprisonment and a $250,000 fine, and a violation of the Freedom of Access to Clinic Entrances Act 18 USC § 248(a)(1), which carries a maximum of 1 year imprisonment and a $100,000 fine.  Mr. Goodman was immediately remanded into custody.  There is no statutory minimum for custody or supervised release for either offense.  There is a minimum sentence of one year probation for Count 1, unless Mr. Goodman is sentenced at the same time to a term of imprisonment, for which a sentence of time served would suffice. 18 USC § 3561(a)(3).

The guideline for an 18 USC § 241 offense is found in USSG §2H1.1.  That section provides that an offense involving individual rights has a base offense level of 12 if the offense

involved two or more participants. USSG §2H1.1(a)(2).  The guideline for 18 USC § 248(a)(1) offenses is also found in USSG §2H1.1. That section provides that an offense involving individual rights has a base offense level of 12 if the offense involved two or more participants. USSG §2H1.1(a)(2).  For the purposes of a guideline's calculation, Mr. Goodman concedes his probation officer's calculation of a category III criminal history but points out that all his previous criminal history stems from non-violent political protest for which Mr. Goodman had no pecuniary motive and nothing personally to gain.  As to Count 2, pursuant to USSG §5G1.1(b), the guidelines range is less, and pursuant to USSG §5G1.2(c), if the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.  Mr. Goodman maintains the calculation ends here, making the offense level 12, with a category III history for purposes of the guidelines, setting his guidelines range at 15-21 months.

However, in her presentence report, Mr. Goodman's probation officer, Ms. Moses-Gregory, proposed two victim related adjustments pursuant U.S.S.G. §3A1.3, i.e. physical restraint, and U.S.S.G. §3A1.1(b)(1), i.e. because "the victim of the offense [Ms. Holler] was a vulnerable victim," [9]  and a Multiple Count Adjustment,[10] bringing his Combined Offense Level to 18.[11] None of these adjustments are warranted.[12]

Firstly, the evidence clearly demonstrates that Mr. Goodman did not "physically restrain" anyone, nor did his codefendant Ms. Marshall.  The law is uniformly against any such expansive reading of "physically restrain." *See, e.g., United States v. Drew*, 200 F.3d 871, 880 (DC Cir. 2000)

---

[9] PSR ¶ 78 citing USSG § 3A1.1(b)(1) for a vulnerable victim adjustment, and PSR ¶ 77 citing USSG § 3A1.3.
[10] PSR ¶ 88 citing USSG § 3D1.4(a).
[11] By this calculation, Mr. Goodman's Adjusted Guidelines Range is 18, and his Criminal History Category is III, providing for a Guidelines Sentencing Range of 33-41 months, and his probation officer recommends a custodial sentence of 27 months. Dkt 528.
[12] Mr. Goodman restates, as if fully stated herein, all the objections he, and his codefendants, made in their replies/oppositions to the presentence reports, and in their sentencing memorandums.

(victim was not subject to physical restraint when defendant ordered victim to leave bedroom and walk down the stairs at gunpoint); *United States v. Anglin*, 169 F.3d 154, 163 (2dd Cir. 1999) (bank tellers were not physically restrained during robbery where defendant brandished a gun, defendant told tellers to get down on the floor and not move, and they did so); *United States v. Bell*, 947 F.3d 49, 60 (3rd Cir. 2020) (defendant did not physically restrain victim by grabbing employee's neck, pointing what appeared to be gun at employee's neck, and throwing employee to the ground, and when employee grabbed defendant's arm in attempt to prevent him from opening cash register, by striking employee with the alleged gun and revealing that it was plastic, as breaking upon impact).

Secondly, [Ms. Holler] does not legally classify as a "vulnerable victim" under any analysis, since pregnancy, as such, without more, does not constitute special vulnerability. There must be evidence that the defendant knowingly exploited the *unusual* vulnerability of a targeted victim. The state of being pregnant does not suffice. *See, e.g., United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) ("The district court did not classify the [victim] as unusually vulnerable simply because she was pregnant. However, her pregnancy created a potential vulnerability *which James acknowledged and exploited when he expressly threatened to kill her unborn child.*" (emphasis added)). The adjustment is only available in cases where the victim is uniquely vulnerable as compared to the typical victim of the offense. *See, e.g., United States v. Caballero*, 277 F.3d 1235, 1251 (10th Cir. 2002) ("the evidence must ... distinguish the victim as atypical of the usual targets of the relevant criminal conduct"); *United States v. Feldman*, 83 F.3d 9, 15 (1st Cir. 1996) ("[I]n order to warrant a finding of unusual vulnerability, there must be some evidence, above and beyond mere membership in a large class, that the victim possessed a special weakness that the defendant exploited."); *United States v. Malone*, 78 F.3d 518, 522 (11th Cir. 1996) ("Enhancing a defendant's sentence solely based on the victim's membership in an arguably 'vulnerable' class does not comport with the purposes of § 3A1.1, because the 'vulnerable victim' adjustment

5

'focuses chiefly on the conduct of the defendant' and should be applied only where 'the defendant *selects the victim'* due to the victim's perceived vulnerability to the offense.")(emphasis added). It was Mr. Goodman's clearly demonstrated intent to witness to a "typical victim" at the Washington D.C. Surgi-Clinic, the mother pregnant with child.

Thirdly, Mr. Goodman objects to a Multi Count Adjustment by double counting the conspiracy and the goal of the conspiracy, (PSR ¶ 88) thus adding 2 units, which has the inordinate effect of creating a guidelines range of imprisonment for a violation of 18 USC § 248(a)(1) at greater than the statutory maximum of 1 year. This adjustment should also be discarded.

However, at any calculation, the guideline range offers no useful advice in this case because it is not based on empirical evidence or national experience relative to the facts in this case. When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure that the purposes of sentencing were met, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might

achieve§ 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

Mr. Goodman maintains that there is no empirical evidence or national experience on which the commission could rely for sentencing recommendations under the guidelines based on the facts and unique convictions in this case. Mr. Goodman and his codefendants are the first ever citizens to which the Government charged "conspiring to violate reproductive health rights" in violation of 18 USC § 241 for organizing and participating in a non-violent civil protest, and for which this Court will for the first time be sentencing the defendants convicted of same. Clearly there is no empirical data or national experience the Commission could have considered in promulgating or amending 18 USC § 241 for sentencing these unique defendants, and this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

In sum, by Mr. Goodman's calculation of the advisory guideline, based on a total offense level of 12 and a criminal history category of III, the advisory imprisonment is 15 to 21 months, such that variance to a sentence of time served (approximately nine months) is appropriate.

Notwithstanding the calculation, Mr. Goodman asserts that his is a case where the guidelines should play no role in sentencing, but rather the statutory factors in 18 U.S.C. § 3553(a) should govern, and the sentence imposed by this Court should be time served, which already far exceeds a typical sentence for participating in non-violent civil disobedience in any other context.

## II. 18 U.S.C. § 3553(a) SENTENCING FACTORS SUPPORT A SENTENCE OF TIME SERVED.

Any calculation of the guideline sentence is only the first step in sentencing decisions. No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op.*, 2010 WL 3940724, *1 (E.D.N.Y. 2010). This Court may impose a sentence outside the calculated guideline range, i.e. a "variance," with a sentence above or below the based on the application of the other statutory factors in 18 U.S.C. § 3553(a).[13] Section 3553(a)(1) requires district courts to consider certain additional factors before imposing a sentence. In his case, Mr. Goodman asks this Court to impose a sentence below any guideline calculation pursuant to Section 3553(a) after consideration of (1) his history, characteristics and family circumstances; (2) the nature and circumstances of the offense; (3) the kinds of sentences available; and (4) ***the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct***. 18 U.S.C. § 3553(a)(1)(3)(6). The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). A substantial variance is needed in this case

---

[13] *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 1294 (U.S. 2013) *citing United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009).

because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which may be taken into account by the guideline range, whereas a sentence of time served is "sufficient but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

### 1. Mr. Goodman's Personal History and Characteristics Demonstrate that he is Deserving of a Substantial Variance.

"The punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Mr. Goodman is a peaceful witness to life, and he should be treated as such. In her report, Ms. Moses-Gregory does a fair job describing Mr. Goodman, i.e. his family, education, struggles, etc. PSR ¶'s 112 – 138.[14] There is no need to restate it all here, other than to point out that what she describes is an interesting, educated, passionate, peaceful man who has had his fair share of personal difficulties and tragedies. It was in 1994, while attending the University of Illinois, that Mr. Goodman became active in the pro-life movement. In the movement, he found a group of people who selflessly dedicated some, if not all, of their free time to represent the rights of the unborn, and to counsel moms and dads on the devastating consequence their choice to abort would not only have on their baby, but on themselves.

From 1994 through 2017, Mr. Goodman made this pro-life ministry a regular part of his life. By 2017, Mr. Goodman could see no better use for his life than committing it completely to trying to save as many babies from death, and moms from a devasting choice, as he could. Thus, since 2017, Mr. Goodman has made the pro-life movement his life's work, traveling around the United States giving his testimony, counseling, and peacefully witnessing. The efforts of Mr. Goodman, his codefendants and folks like them seem to be having some effect as nearly two-dozen states have banned or severely restricted abortion. More personally, Christina Evaldi

---

[14] PSR ¶ 126a improperly states that "Mr. Goodman has a history of suicidal attempts." Mr. Goodman has sought treatment for suicide ideation but has never made a suicide attempt.

wishes she had crossed paths with Mr. Goodman before choosing to abort her child, a decision she says has immeasurably damaged her life.[15] Mary Wagner recounts that "because of Will and his friends, who appealed to a pregnant woman entering an abortion facility, a child, now a young man, lives today." [16] Sally Hernandez well summarizes the effects the witness of Mr. Goodman has: *"We know of mothers who were abortion-minded but left and did not return. God changes hearts, we do not, but we are His voice, His hands, His heart. This is what Will offers with his peaceful, prayerful presence: a last chance, the light of hope, faith in Divine Providence and the blessing for embracing the life of the baby in the womb.*[17]

What type of man chooses such a singularly selfless path? Generous, loving, and compassionate come to mind. Attached hereto as <u>Exhibit E</u> are letters from family and friends attesting to Mr. Goodman's character and value to his family and the community. For example:

Mr. Goodman's parents write of Mr. Goodman:

*"We believe his character is defined by kindness, trustworthiness, honesty and is truly interested in people."*

Mr. Goodman's uncle Richard writes:

*"Will is a very principled man. He lives by what he believes more than anyone I have ever met; and I am 86 years old."*

Oscar Clemotte, Ph.D writes of Mr. Goodman:

*"Will Goodman is an intelligent, honest and sensitive person with excellent intellectual and moral qualities and a deep love for all humans, especially the most vulnerable among us."*

Monica Miller, Ph.D writes of Mr. Goodman:

*"If there was one word to describe him—that word is "compassion." Will is extra-*

---

[15] <u>Exhibit B</u>: Statement of Christina Evaldi.
[16] <u>Exhibit C</u>: Statement of Mary Wagner.
[17] <u>Exhibit D</u>: Statement of Sally Hernandez.

*ordinarily sensitive to the needs and suffering of others, a person of deep Christian faith and prayer—a person soft-spoken, gentle and kind. He has chosen a path of poverty in imitation of Christ—shunning material success, he shares the life of the poor."*

Sister Mary Alix writes of Mr. Goodman:

*"Having known Will Goodman for over 25 years, I can speak to the peaceful, caring man that he is. Indeed, his non-violent way of approaching the issue of abortion inspired me to become a Catholic nun who spends her life praying for the victims of abortion."*

Lisa Bauer writes of Mr. Goodman:

*"Will has a deep love for all people as he understands we are all created in the image and likeness of God. It is his profound love and gentleness that compelled him into action in October 2020."*

Gerald Murphy writes of Mr. Goodman:

*"Like Saints Peter &Paul and all Christ's apostles who risked imprisonment in service to His Gospel message of love and mercy for all humanity, Will risks imprisonment so that women will know God's love for them and for their unborn child."*

Mike Schmiedicke writes of Mr. Goodman:

*"I have known Will for years and I have rarely met another person who was gentler, kinder, or more generous."*

Lynn Kujak writes of Mr. Goodman:

*"Will Goodman's heart is filled with compassion for all people, born and preborn, he is a person of deep prayer and love for our Lord Jesus Christ and a sincere defender of life."*

Theresa Bonopartis, a post abortion healing expert writes of Mr. Goodman:

*"He has a deep compassion for the suffering and has no ill will towards anyone who has participated in abortion. In fact, just the opposite, he is concerned with their healing. He is kind*

11

*and giving, and there is not a violent bone in his body. To be honest it is mind blogging to have him characterized as such."*

Eric Holberg writes of Mr. Goodman:

*"I can count on ten fingers the men I have known in my 70 years with the excellence of his character: kind, loving, gentle, gracious, honest, and one of the most self-giving people I have ever met."*

Kathy Foerster writes of Mr. Goodman:

*"Will is always respectful of other people. He is generous of his time and talents. He does things in love and compassion. He is not a violent person and believes that respect, love, and truth are the avenues to help people. Will puts others needs before his own and knows that because of his commitment to life, he will suffer in many ways."*

Father Stephen Imbarrato says of Mr. Goodman:

*"It is quite easy for me to describe Will as a gentle and considerate man who cares deeply for others especially those who are in distress. I know and am convinced that Will acted in good conscience intervening peacefully and prayerfully to save babies' lives from abortion which the Catholic Church teaches is murder."*

Rita Vitale well describes Mr. Goodman

*"Will Goodman is a man of good will."*

Suzanne Abdalla says:

*"He's about the only person I know who has never said an unkind word to me in all of my life. Honestly I can never remember even hearing him raise his voice in anger. He is fully committed to non-violence in every action he takes. I have never heard a lie escape his lips. I wish that I could be as good a person as he is."*

And, Hayden Laye writes of Mr. Goodman:

12

*"Over the course of the trial I was honored to be able to sit down with Mr. Goodman and befriend him. I learned what a great man he is and I hope that you can recognize what a wonderful man he is."*

Mr. Goodman's character and history is that of a peaceful man and citizen committed to non-violent witness and political protest a practice he believes destroys lives. Mr. Goodman's decision to selflessly devote his life to an effort is not unlike that seen in other social protest movements: passive, non-violent civil disobedience, which Dr. Martin Luther King famously described as follows: "direct action, whereby we would present our very bodies as a means of laying our case before the conscience of the local and national community.[18] Mr. Goodman is rewarded every time someone chooses life, but his efforts sometimes come at a cost, i.e. arrests, and sometimes brief incarcerations. Notably, every single arrest in Mr. Goodman's life (PSR ¶'s 96 – 108) has been tied solely action in the United States' tradition of civil disobedience to affect change as a non-violent witness to life. Mr. Goodman's character and history of non-violent selfless civil disobedience supports a variance from any guideline suggestion to the more than sufficient sentence of time served.

**2. The Nature and Circumstances of the Offense Present Significant Mitigation.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571,

---

[18] Dr. Martin Luther King, "Letter from a Birmingham Jail", chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.csuchico.edu/iege/_assets/documents/susi-letter-from-birmingham-jail.pdf

590 (February 2005).  Moreover, the underlying offense here is categorized as a Class A misdemeanor. It is almost universally recognized that "Class A misdemeanors are one of the least serious offenses prosecuted in federal court." *United States v. Dawson*, No. 1:22-CR-00107-SAB-1, 2022 WL 3327463, at *2 (E.D. Cal. 2022); *accord*, *United States v. Lambson*, No. CR 17-27-M-DLC, 2018 WL 443453, at *2 (D. Mont. 2018); *United States v. Fawster*, No. 1:12-MJ-364PAS, 2013 WL 4047120, at *4 (D.R.I. 2013); *United States v. Montecalvo*, 861 F. Supp. 2d 110, 115 (E.D.N.Y. 2012); *United States v. Nash*, No. 2:08-MJ-00678-RJJ-RJ, 2010 WL 702438, at *2 (D. Nev. Feb. 19, 2010).  Earlier herein were discussed the motivations for having the sit-in protest at the Washington D.C. Surgi-Clinic.  Again, virtually all of Mr. Goodman actions on October 20th, 2020, were caught on some form of visual media which clearly depict the nature and seriousness of the harm he caused or threatened, i.e. Mr. Goodman clearly touches no one, threatens no one, and abuses no one.  For the most part, Mr. Goodman kneels and prays, clearly demonstrating his singular motive to saving lives.  The guidelines take no account for this type of selfless non-violent behavior which supports a substantial deviation from any guidelines.

    3. **The Kinds of Sentences Available**

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall* 552 at 59 & n.11 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007). According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines.  Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to

ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.")

Again, ultimately, this Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009). Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those ***violent and serious criminal offenders*** who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." (emphasis added). *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). In addition, Mr. Goodman is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society." Instead, Mr. Goodman has demonstrated a history of non-violent protest and a sentence that includes additional imprisonment in his case is unnecessary and unwarranted, if not in fact cruel and unusual in the context of peaceful, non-violent civil disobedience. Rather, the American tradition of non-

violent, selfless civil disobedience in movements for social change, supports a variance from the guidelines and the more than sufficient sentence of time served is the appropriate loss of his freedom for his actions.

**4. The Need to Avoid Unwarranted Disparity Among Similar Offenders.**

The Court must also consider the need for consistency in sentencing to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* § 3553(a)(6). In this case, the Government novelly charged these defendants for conspiracy to violate reproductive rights, a charge the Government has not applied to other similar type protests in the past, and for which no court has ever sentenced any other defendant in the entire country. Notably, the Judiciary Sentencing Information (JSIN) database, an appropriate source for the Court to use to avoid disparate sentences, generates the same result no matter the offense level assigned (12, 14,16 or 18) with a criminal III history to primary guideline USSG §2H1.1, i.e. there was an insufficient number of defendants … (2) who received a sentence of imprisonment in whole or in part."[19] Based on these results, it appears virtually everyone in the position similar to Mr. Goodman received no term of imprisonment at sentencing in whole or in part. Without a clear guide, this Court must avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range,[20] and it is free to consider the sentence similarly situated folks meeting up to engage in non-violent political protest across the country might realize, in this case, possibly based on the violation of 18 USC § 248(a)(1) which carries a maximum of 1 year imprisonment. Should the Court impose a sentence of time served (i.e. 9 months incarceration), it would be consistent with sentences other defendants received who were found guilty of similar conduct. In addition,

---

[19] See Exhibit F
[20] See *Gall*, 552 U.S. at 55.

below is a table which includes cases in which defendants received sentences substantially below the guideline ranges applicable in those cases.  This Court should consider the sentencing trend exemplified by this list.[21]

| Case | Conviction | Sentence |
|---|---|---|
| *United States v. Colton Partin*, Case No.: 11-cr-00100 (E.D. Tn. 2012) | 18 U.S.C. § 241 Conspiracy Against Rights | 18 months' probation with 6 months in home detention<br>300 hours community service<br>$24.47 restitution<br>$100 Special Assessment |
| *United States v. Raymond Parisi*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241 Conspiracy Against Rights | 5 years' probation<br>$100 Special Assessment |

---

[21] In its sentencing memorandum, the government lists five cases in support of its recommendation of a mid-range guidelines sentence of imprisonment for Mr. Goodman.  *See* Gov. Sent. Memo. at 14-15.  However, these cases further support the fact that a sentence of time served is a reasonable sentence in this case:

- *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976): the defendant was sentenced to one to three years' imprisonment for his role in the Watergate scandal during the Nixon administration.  Liddy, acting in the capacity of an officer and employee of the U.S. government as Staff Assistant to the President of the United States, was one of the principal organizers in the scheme.

- *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995): the defendant, a member of the Ku Klux Klan, was sentenced to five years' imprisonment for his role in burning a cross in the yard of the victims who were black. One of the co-defendants subsequently fired at least three shots into the air from a .22 caliber pistol in front of the victims' home.

- *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000): the defendant was sentenced to 21 months' imprisonment for his role in burning a cross in the yard of the victims who were black. One week prior to this incident, the defendant alongside his co-defendants yelled racial epithets at a black teenager who passed by them on the sidewalk.

- *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003): the defendant, a member of a white supremacist, neo-Nazi group, was sentenced to 120 months' imprisonment for his role in conducting a so-called "park patrol" to "clean out all the minorities", if necessary through violence.  The defendants were armed with axe handles, flat bars, chains, and broomsticks, to use during the "patrol".  They yelled racial slurs at several individuals, threatened that they would kill them, and chased them out of the park.

- *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012): the defendant, a correctional officer, was sentenced to 120 months' imprisonment for using excessive force on non-aggressive, compliant pre-trial detainees, effectively assaulting them by slamming them into walls or metal counters, striking them, or placing them in painful wrist locks.

| *United States v. James Bradley Weems*, Case No.: 06-cr-40012 (W.D. Ar. 2007) | 18 U.S.C. § 241 Conspiracy Against Rights, Including the Burning of a Cross | 1 month imprisonment 2 years supervised release with first 5 months in home detention $2,000 fine $100 Special Assessment |
|---|---|---|
| *United States v. Jason Branum*, Case No.: 13-cr-00573 (C.D. Ca. 2016) | 18 U.S.C. § 241 Conspiracy Against Rights, 18 U.S.C. § 242 Deprivation of Rights Under Color of Law, 18 U.S.C. § 1519 Falsification of Records, Aiding and Abetting | 5 months' imprisonment 2 years supervised release $300 Special Assessment |
| *United States v. Douglass Mackey*, Case No.: 21-cr-00080 (E.D.N.Y. 2023) | 18 U.S.C. § 241 Conspiracy Against Rights | 7 months' imprisonment 2 years supervised release $15,000 fine $100 Special Assessment |
| *United States v. Christopher Brown*, Case No.: 13-cr-00017 (E.D. Ok. 2017) | 18 U.S.C. § 241 Conspiracy Against Rights, 18 U.S.C. § 242 Deprivation of Rights Under Color of Law, 18 U.S.C. § 1001 False Statement | 12 months' imprisonment 3 years supervised release $300 Special Assessment |
| *United States v. James Smiley*, Case No.: 11-cr-00100 (E.D. Tn. 2012) | 18 U.S.C. § 241 Conspiracy Against Rights | 12 months' imprisonment 3 years supervised release 300 hours community service $24.47 restitution $100 Special Assessment |
| *United States v. Kyle Montgomery*, Case No.: 11-cr-00100 (E.D. Tn. 2012) | 18 U.S.C. § 241 Conspiracy Against Rights | 12 months' imprisonment 3 years supervised release 300 hours community service $24.47 restitution $100 Special Assessment |
| *United States v. Gary Wilkins*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241 Conspiracy Against Rights | 12 months' imprisonment 3 years supervised release $100 Special Assessment |

| | | |
|---|---|---|
| *United States v. Richard Tobin*, Case No.: 21-cr-00173 (D.N.J. 2021) | 18 U.S.C. § 241 Conspiracy Against Rights | 12 months and 1 day imprisonment<br>3 years supervised release<br>$7,000 restitution<br>$100 Special Assessment |
| *United States v. Joseph Downen*, Case No.: 98-cr-00407 (D. Ariz. 1999) | 18 U.S.C. § 241 Conspiracy Against Rights, 18 U.S.C. § 371 Conspiracy, 18 U.S.C. § 1001 False Statement | 15 months' imprisonment<br>3 years supervised release<br>$5,500 restitution<br>$300 Special Assessment |

## II.   CONCLUSION

As noted earlier, Congress has identified the purposes of federal sentencing that must guide district courts in imposing a sentence. The sentence must be "sufficient, ***but not greater than necessary***" (emphasis added) to serve those purposes. We respectfully submit that the purposes of federal sentencing would be fully served in this case by imposition of a sentence of time served, a much longer sentence than ever given for this type of behavior, and one which, given the facts of this case, is enough to "reflect the seriousness of the offense, to promote respect for the law, as well as provide just punishment for the offense" ( § 3553(a)(2)) and to "afford adequate deterrence to criminal conduct." § 3553(a)(3).[22] As for the public's protection, whether one agrees with them or not, the non-violent political actions of Mr. Goodman, and his codefendants, are typical of what has been seen in every other movement for social change in our nation's history and are of the type that protect our democracy. The viewpoint from which Mr. Goodman has engaged in non-violent civil disobedience in the context of the pro-life movement should have no bearing on the length of his sentence.

---

[22] Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

Date: 4/12/2024                          Respectfully submitted,

/s/ _____
Howard J. Walsh III
Counsel for Mr. Goodman
7101 Wisconsin Ave Suite
Bethesda, MD 20814
301-576-7900 (FX)
240-277-6477 (Cell)
Hwalshesq@gmail.com

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of this motion on the United States via the Court's CM/ECF System on this 19th day of April 2024.

/S/ _____
Howard J. Walsh III

20